UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

EDWIN ROACH,

                                    Plaintiff,

            v.                                              7:05-CV-1413
                                                            (NAM/GJD)

COMMISSIONER OF SOCIAL SECURITY,

                                    Defendant.
_____

LAWRENCE D. HASSELER, ESQ., Attorney for Plaintiff
VERNON NORWOOD, ESQ., Special Asst. U.S. Attorney for Defendant

GUSTAVE J. DIBIANCO, Magistrate Judge

## REPORT AND RECOMMENDATION

This matter was referred to me for report and recommendation by the

Honorable Norman A. Mordue, Chief United States District Judge, pursuant to 28

U.S.C. § 636(b) and Local Rule 72.3(d).  This case has proceeded in accordance with

General Order 18.

## PROCEDURAL HISTORY

Plaintiff protectively filed an application for disability insurance benefits

("DIB") and supplemental security income ("SSI") on August 1, 2002 and December

12, 2002, respectively.  (Administrative Transcript ("T") at 15, 82-84, 458-61).  The

applications were denied initially, and plaintiff requested a hearing.  (T. 37-38).  An

initial and supplemental hearing were held before an Administrative Law Judge

("ALJ") on May 24, 2004 and February 8, 2005.  (T. 477-578).  In a decision dated

1

April 7, 2005, the ALJ found that Plaintiff was not disabled.  (T. 12-27). The ALJ's

decision became the final decision of the Commissioner when the Appeals Council

denied plaintiff's request for review on September 16, 2005.  (T. 5-11).

## CONTENTIONS

The plaintiff makes the following claims:

(1) The ALJ erroneously failed to find that Plaintiff qualified for a presumption of disability because his impairment rises to the level of a listing in Appendix 1 of 20 C.F.R. Part 404, Subpart P.  (Brief, p. 13-15).

(2) The ALJ failed to properly weigh the opinions of Plaintiff's treating physician, examining physicians, and other medical opinions of record.  (Brief, p. 15-17).

(3) The ALJ failed to properly determine Plaintiff's residual functional capacity ("RFC").  (Brief, p. 18-21).

(4) Substantial evidence did not support the ALJ's conclusion that there was significant work in the national economy that Plaintiff could perform.  (Brief, p. 21-22).

(5) The ALJ failed to properly assess Plaintiff's credibility.  (Brief, p. 22-23).

The defendant argues that the Commissioner's determination is supported by

substantial evidence in the record, and must be affirmed.

## FACTS

**A.**     **Non-Medical Evidence and Testimony:**

Plaintiff, who was forty-five years old at the time of the hearing, completed

high school and earned a Bachelor's degree in anthropology.  (T. at 16, 82).  Plaintiff

has previously worked as a cutoff saw operator, a millwright apprentice, a

2

maintenance mechanic, and an automobile mechanic. (T. 485). Plaintiff alleges that he became disabled on February 5, 2002, due to the combined effects of work-related injuries resulting in amputations of fingers from both hands; osteoarthritis of the hips; lower back pain; migraine headaches; mental impairments including dysthymia, insomnia, and diminished memory and concentration; and side effects from medications including dizziness and fatigue. (T. 82, 491-532, 550-56).

At the initial and supplemental hearings on May 24, 2004 and February 8, 2005, Plaintiff testified that his most serious impairment stems from his loss of his fingers. (T. 501-03). He stated that he has constant pain ranging from a three to an eight on the ten-point pain scale. (T. 501-03). He stated that his left hand was "almost like a club hand," which he could not use. (T. 550). Plaintiff testified that he drops things "all the time" with both of his hands. (T. 551).

He also testified that he suffers degenerative arthritis in his hips and pain in his lower back, neck, shoulder, and arm. (T. 504-05). He testified that he had migraines twice per week, lasting from twelve hours to two days each and causing blurred vision, nausea, and vomiting. (T. 511, 523, 550). According to Plaintiff, treatment for Hepatitis C leaves him "violently ill," with symptoms including "heavy-duty flu-like symptoms," chills, fever, and joint pain. (T. 505, 516). He stated that Neurontin and Baclofen leave him dizzy and light-headed. (T. 517).

Plaintiff estimated that he could only sit for one hour, stand for one hour, and

walk for an hour and a half in a workday, due to pain in his hips, lower back, neck, and shoulder.  (T. 518-19).  He felt he could lift and carry five to ten pounds and push five pounds.  (T. 519-20).  He stated he was unable to stoop and bend forward at his waist due to balance problems.  (T. 520-21).  Plaintiff testified that crouching and kneeling were possible but difficult due to pain and numbness in his hips, legs, and knees.  (T. 521).  He testified that crawling was impossible because he could not support his weight on his hands, and he could not climb a ladder because of balance problems.  (T. 521-22).  He testified to losing his balance about three times per day, and that his limited hands prevent him from breaking his fall.  (T. 522, 555-56).  He also stated that he had difficulty reaching and manipulating objects.  (T. 523).  He testified that he was depressed and had no energy.  (T. 554).  He stated that his short-term memory and concentration were limited, and that he had difficulty in social situations and when dealing with the public.  (T. 524, 555).

Plaintiff testified that, at the time of the hearings, he was able to take care of his own personal needs, drove his car at least four days per week, shopped for groceries and clothing, vacuumed, swept the floors, did some home repairs, watched television, visited friends, went to the movies and football games, and occasionally attended church.  (T. 487, 526-31).

The ALJ asked David Festa, a vocational expert ("VE"), to assume a hypothetical person of the same age, education, and work experience as Plaintiff who

4

could lift and/or carry fifty pounds occasionally, forty pounds frequently, and

manipulate fifteen pounds constantly; could not do fine manipulations with either

hand; had a limited ability to do repetitive reaching with his left arm; could not climb

ladders, ropes, scaffolds, or any place where a strong grip was required; and was

limited to low stress work with low production quotas.  (T. 567-69).  VE Festa

testified that such a person could perform unskilled work that did not require

repetitive fingering.  (T. 570).  He cited surveillance systems monitor, counter clerk,

and charge counselor as examples of work which existed in significant numbers in

the national economy that Plaintiff could perform.  (T. 571-72).  VE Festa stated that

this testimony was consistent with the information in the Dictionary of Occupational

Titles and Selected Characteristics of Occupations.  (T. 572).

**B.**   **Medical Evidence**

    **1.**   **Treating Sources**

        **a.**   **Dr. William Saber**

Following a saw injury in which Plaintiff amputated the tip of his right thumb,

Plaintiff underwent amputation revision surgery at Lutheran Medical Center on

November 27, 2000.  (T. 155-56).  A second surgery was performed on March 1,

2001, when the residual nail matrix from Plaintiff's right thumb was excised.  (T.

174, 196).  From December 1, 2000 through January 18, 2002, Plaintiff was seen for

follow-up examinations at Alpine Plastic Surgery Associates, where he was treated

by Dr. William Saber.  (T. 157-90).  Plaintiff's condition steadily improved, and he

was approved to return to full regular duty work by Dr. Saber on March 14, 2001.

(T. 157-77).  Dr. Saber noted that Plaintiff had regained a full range of motion

("ROM") in his right thumb as of that date.  (T. 175).

### b.    Columbia Presbyterian/St. Luke's Medical Center

On October 30, 2001, Plaintiff suffered another work-related injury in which

he partially amputated his left thumb, left middle finger, and left ring finger, and

lacerated his left index finger.  (T. 199-215).  He underwent a third surgery at

Columbia Presbyterian/St. Luke's Medical Center in order to replant his left thumb

and repair the nerves and tendons of his fingers.  (T. 199-215).  In this surgery

Plaintiff's left thumb was surgically amputated, and his index and middle fingers

were replanted and repaired.  (T. 199-215).

### c.    Center for Hand Rehabilitation

Plaintiff participated in hand therapy approximately three times per week after

his surgery of October 30, 2001.  (T. 222-32).  Plaintiff's hand therapy sessions

continued through July 24, 2002, at which point his hand therapist noted that

Plaintiff's progress had plateaued, and that he was ready to be discharged to a home

exercise program.  (T. 220-32, 245-71, 289-330, 395-97).

### d.    Dr. Caroline Gellrick

From November 1, 2001 through September 6, 2002, Plaintiff was treated by

Dr. Caroline Gellrick at the Exempla Occupational Medicine and Rehabilitation Center.  (T. 216-19, 276-88).  On November 9, 2001, Dr. Gellrick cleared Plaintiff to return to light duty work.  (T. 218-19).  Dr. Gellrick completed tenolysis (release of the tendon) on November 30, 2001, after Plaintiff complained of contractures in his index and middle fingers that would not release.  (T. 219).

On December 27, 2001, Plaintiff had a fourth surgery in which a painful mass at the tip of his amputation was excised.  (T. 273).  This surgery was performed by Plaintiff's hand surgeon, Dr. Conrad Tirre.  (T. 273).  On March 4, 2002, Plaintiff reported to Dr. Gellrick that he had recently been fired from his job and was applying for unemployment insurance benefits.  (T. 279).  On August 15, 2002, Dr. Gellrick noted that Plaintiff's left hand condition was likely to be permanent since no further surgeries were anticipated.  (T. 285).

Plaintiff complained of depression to Dr. Gellrick, who noted that this condition was related to Plaintiff's hand injuries.  (T. 276-78).  Dr. Gellrick referred Plaintiff to Dr. Cameron, a psychiatrist, for mental health treatment.  (T. 278, 412).

### e.   **Dr. Conrad Tirre**

Dr. Conrad Tirre performed Plaintiff's hand surgeries, including a fifth surgery which took place on April 30, 2002 for tenolysis of the flexor tendons in Plaintiff's left middle and ring fingers.  (T. 332).  Plaintiff was seen by Dr. Tirre for follow-up examinations of his various surgeries from November 1, 2001 through July 29, 2002.

(T. 233-39).  On July 29, 2002, Dr. Tirre assessed that Plaintiff had reached

maximum medical improvement ("MMI").  (T. 238).

### f.    Dr. Shara Peets - United Helpers Community Health Center

Plaintiff was treated by Dr. Shara Peets, a general practice physician, from

August 25, 2003 through April 29, 2004.  (T. 426-34, 450-53, 466-68).  On August

25, 2003, Plaintiff complained of lateral hip pain, acid reflux disease, insomnia, and

depression.  (T. 426).  Dr. Peets prescribed Prilosec for heartburn, Lexapro for

depression, and Hydroxyzine for anxiety.  (T. 426).  She recommended bilateral hip

X-rays and a blood test and referred Plaintiff to a mental health clinic.  (T. 426).  Dr.

Peets scheduled a follow-up visit for one month, and advised plaintiff to contact the

mental health clinic for treatment of his depression.  (T. 426)

Plaintiff's next visit with Dr. Peets was approximately two weeks later on

September 10, 2003 when plaintiff complained of hip pain and depression.  (T. 427).

Plaintiff told Dr. Peets that the Lexapro was effective in treating his depression, and

that he did not contact the mental health clinic.  (T. 427).  Dr. Peets notes state that

plaintiff's gastroesophageal reflux disease (GERD) was controlled by using Prilosec.

(T. 427).  On examination, Dr. Peets found plaintiff in "no acute distress," and

ordered an orthopedic consultation.  She also advised plaintiff to stop "all

consumption of alcohol."  (T. 427).  Dr. Peets observed that Plaintiff's blood tests

had revealed mildly elevated cholesterol, elevated liver function, rheumatoid

arthritis, and mild osteoarthritis of the hips.  (T. 427).

Plaintiff returned six days later complaining of joint pain and urinary symptoms.  (T. 428).  Dr. Peets diagnosed persistent dysuria and osteoarthritis of plaintiff's hip. (T. 428).  Plaintiff told Dr. Peets that his hip pain bothers him with weather changes and prolonged sitting or standing.  (T. 428).  He stated that he had used Vioxx previously, and that medication helped.  One month later, on October 14, 2003, Dr. Peets diagnosed Hepatitis C, and she referred plaintiff to the Hepatitis C clinic. (T. 429). She also referred plaintiff to physical therapy for his persistent right hip pain. (T. 429).

On October 20, 2003, plaintiff visited Dr. Peets for a "disability physical."  (T. 430).  Plaintiff told Dr. Peets that he has "work limitations due to his amputations and can't lift more than five pounds or do any work over his shoulders."  (T. 430). Plaintiff told Dr. Peets that he is applying for disability, and she apparently completed a disability form which does not appear to be in the Administrative Record.  (T. 430).

On November 11, 2004, Dr. Peets diagnosed depression for which she prescribed Prozac. (T. 431).  Dr. Peets scheduled another follow-up for three months. (T. 431).  Less than two weeks later, on November 25, 2003, plaintiff complained of lower back pain.  (T. 432).  On examination, Dr. Peets found that plaintiff was alert and in no acute distress.  Although plaintiff exhibited a minor amount of discomfort

when lying down and sitting up.  (T. 432).  Dr. Peets found moderate sacral

tenderness and pain with straight leg raising tests.  (T. 432).

Plaintiff's next visit to Dr. Peets was on February 13, 2004, when plaintiff

complained of migraine headaches. (T. 433). Plaintiff told Dr. Peets that he had a

"history of migraines in the distant past" (T. 433), and was getting migraines

approximately two or three times a week (T. 433).  Dr. Peets prescribed Imitrex.  (T.

433).

On April 29, 2004, Plaintiff reported to Dr. Peets that the Imitrex had been

helpful and that he had begun treatment in the Hepatitis C clinic. (T. 434).  Plaintiff's

visit that day was for abdominal pain and irritable bowel syndrome.  (T. 434).  In a

letter dated May 19, 2004 addressed "To Whom It May Concern," Dr. Peets stated

that Plaintiff had a history of bilateral hand injuries, including an amputation of part

of his right thumb and fourth finger.  She stated that plaintiff had contractures

involving certain finger joints.  (T. 435).  Dr. Peets concluded

> due to post-traumatic amputations and contractures, he is unable to use
> his hands in any meaningful type of employment.  Use of the hands for
> lifting, pushing, and carrying is severely restricted.  Fine motor function
> of both hands is severely impaired interfering with activities such as
> dressing and bathing.

(T. 435).  Dr. Peets also stated that plaintiff was unable to do activities which

required the use of his hands, such as climbing or crawling.  (T. 435).  He had no

limitations in his ability to sit, but his postural activities were moderately limited due

to left arm pain.  (T. 435).  He had no environmental limitations.  (T. 435).

On June 17, 2004, Dr. Peets prepared a letter entitled "Further Documentation Regarding Disability."  Apparently this was in response to a request to expand upon her May 19, 2004 letter.  (*See* T. 435).  In this letter, Dr. Peets clearly states that ***plaintiff*** gives a history of low back pain since 1989 and plaintiff had a flare up of sciatic pain with radiation to his right leg.  (T. 449).  Dr. Peets also states that plaintiff experiences hip pain with prolonged sitting of fifteen minutes or more, and that ***plaintiff*** notes environmental restrictions.  On examination, Dr. Peets found plaintiff in no acute distress with intact gait and a negative Romberg test.  She found that one foot standing and heel-and-toe standing were normal, and that plaintiff was "able to squat."  Plaintiff was able to get on and off an examination table without assistance, and his straight leg raising test was normal.

Approximately one month later in a letter dated June 25, 2004, also addressed "To Whom It May Concern," Dr. Peets expanded on several of the statements from her May 19, 2004 letter.  (T. 436).  She again commented on plaintiff's hand injuries, and added that plaintiff had a history of low back pain since 1989.  It is unclear where the information about plaintiff's history of low back pain since 1989 comes from since Dr. Peets treated plaintiff beginning in 2003, and apparently did not review any records from other medical practitioners between 1989 and 2003.  Dr. Peets also commented on plaintiff's hip pain "since August 2002."  (T. 436).  It is

11

unclear whether the reference to August 2002 is a typographical error, or whether Dr. Peets meant that plaintiff had bilateral hip pain for one year prior to his visit to her in August 2003.  (*See* T. 436).  Dr. Peets's repeated reference to plaintiff's inability to use his hands "in any meaningful type of employment," and added that plaintiff "experiences painful hands with use and pain of his left arm with postural positioning."  (T. 436).  Dr. Peets added that plaintiff has balance problems, difficulty climbing stairs, a tendency to fall backwards, limited squatting, environmental restrictions, and inability to tolerate vibration.  (T. 436).  She also stated that there is objective impaired pinprick sensation of the anterior aspect of plaintiff's left hand.  (T. 436).

On August 13, 2004, Dr. Peets reported Plaintiff's complaints of migraines, for which the prescribed Imitrex had not been helpful.  (T. 450).  Dr. Peets prescribed Neurontin, Zomig, and Nabumetone, and discontinued Imitrex.  (T. 450).  On October 5, 2004, Plaintiff told Dr. Peets that he was sleeping better and that he had less musculoskeletal discomfort.  (T. 451).  Plaintiff returned on November 12, 2004 to follow-up on his gastroesophageal reflux disease (GERD) and skin lesions.  (T. 452).  Dr. Peets noted that plaintiff's symptoms of GERD had improved, and that plaintiff wanted stronger medication for his pain.  (T. 452).

Plaintiff complained of increased hip pain on January 5, 2005. (T. 453).  At that time, plaintiff was taking hydrocodone (ten milligrams) and wanted to increase

12

the dosage.  On examination, Dr. Peets found that plaintiff was in no acute distress, his abdomen was normal, and straight leg raising tests were normal.  Plaintiff did have tenderness in his anterior hip region.  (T. 453).  Dr. Peets prescribed Relafen and Lortab.  (T. 453).  On February 11, 2005, plaintiff visited Dr. Peets complaining of right knee pain, and stated that he experienced this pain "for over a year."  Plaintiff stated that he fell in May and June "making it worse."  (T. 466).  On examination, Dr. Peets found that plaintiff's right knee examination was unremarkable.  Her impression was that plaintiff had "right knee pain and giving out."  (T. 466).  Plaintiff reported that Zomig had helped to alleviate his migraines, but it put him to sleep for two hours at a time.  (T. 466).  Dr. Peets prescribed Inderal LA for Plaintiff's migraine headaches and recommended physical therapy for his right knee.  (T. 466).  Approximately two months later on April 5, 2005, Plaintiff reported that Inderal LA, Relafen, and Lortab had each been helpful. (T. 467).  Dr. Peets observed that an X-ray of Plaintiff's right knee revealed minimal osteoarthritic changes. (T. 467).  She assessed osteoarthritis of the right knee and that Plaintiff's migraine headaches were stable.  (T. 467).

### g.   Dr. Michael Camillo

On January 26, 2005, Dr. Michael Camillo, a psychiatrist, completed a mental health medical report for the Social Security Administration.  This included a medical assessment of plaintiff's mental ability to do work related activities.  (T.

445-448).  Although there are no treatment records, Dr. Camillo stated in his one sheet summary (T. 445) that plaintiff was treated in out-patient mental health services between June 24, 2004 and December 29, 2004.  (T. 445, 448).  Dr. Camillo's clinical findings were that plaintiff had a "history of dysthymia and limited adaptive coping skills."  (T. 445).  The only diagnosis made by Dr. Camillo was dysthymic disorder.  (T. 445).  Dr. Camillo stated that plaintiff "has stabilized and is cooperative with services."  The prognosis was "favorable for improving general coping skills."  (T. 445).

In his assessment of plaintiff's mental capacity for work, Dr. Camillo completed a form and stated that generally, plaintiff had fair abilities to make occupational adjustments (T. 446), fair abilities to make performance adjustments (T. 447), and fair ability to make personal/social adjustments.  The form requested that Dr. Camillo describe any limitations for the boxes he checked, but no additional information was given in any of the three categories.  (T. 446, 447).  Dr. Camillo also did not add any information about other work-related activities affected by plaintiff's dysthymic disorder.  (T. 447).

According to the definitions on the medical assessment of mental ability (T. 446), a fair ability means that plaintiff had a limited ability to function in a particular area, but the level of that function was satisfactory.  (T. 446).  There was only one box checked as being "poor" ability, and that was plaintiff's ability to deal with work

14

stress.  (T. 446).  Plaintiff had a fair ability to deal with the public; use judgment;

interact with supervisors; function independently; maintain attention/concentration;

understand, remember, and carry out simple, detailed, and complex instructions;

maintain his personal appearance; behave in an emotionally stable manner; relate

predictably in social situations; and demonstrate reliability.  (T. 446-47).

### h.   **Dr. Ron Carbaugh**

Plaintiff was examined by psychologist Dr. Ron Carbaugh on January 31,

2002 and February 7, 2002, for complaints of depression, anxiety, and insomnia.  (T.

412-13).  On the first visit, Dr. Carbaugh diagnosed a nonspecific depressive

disorder in addition to probable avoidant and dependent traits.  (T. 412).  On

February 7, 2002, Dr. Carbaugh noted that Plaintiff's sleep had improved by taking

Ambien.  (T. 413).

### 2.   **Examining Sources**

### a.   **Dr. Bedros Bakirtzian**

On December 9, 2003, Dr. Bedros Bakirtzian performed an orthopedic

evaluation.  (T. 420).  Dr. Bakirtzian observed a ninety degree flexion contracture of

Plaintiff's left index and middle fingers and a sixty degree contracture of his distal

interphalangeal joint.  (T. 420).  A positive percussion sign was found over his

median nerve, and he suffered pain on attempted mobilization of his wrist.  (T. 420).

Dr. Bakirtzian diagnosed right carpal tunnel syndrome.  (T. 420).  He increased

Plaintiff's Vioxx dosage and prescribed Vicodin.  (T. 420).  At a January 15, 2004 follow-up examination, Dr. Bakirtzian prescribed Amitriptyline for depression, and Baclofen and Neurontin for pain.  (T. 421).  On February 26, 2004, Dr. Bakirtzian noted that plaintiff was complaining of persistent pain and numbness in his left hand. (T. 421).

### b.   Dr. David Yamamoto

Dr. David Yamamoto performed an independent medical examination for Workers' Compensation on September 23, 2003.  (T. 355).  The left posterolateral aspect of plaintiff's neck was tender, he had moderately decreased motion, and he was tender in his left trapezius, rhomboid area, lateral shoulder, forearm, and bilateral flanks and hips.  (T. 360).  The index and middle fingers of his left hand were flexed at 90-95 degrees, and he was unable to extend them.  (T. 360).  He had intermediate loss of sensation over his left thumb, and his index and middle fingers were "almost totally anesthetic."  (T. 360).

In addition to his amputations, he was diagnosed with secondary depression and myofascial pain of the neck, left trapezius, left upper back, and bilateral hips. (T. 360).  Although Dr. Yamamoto stated that he did not have the functional capacity evaluation to review, Dr. Yamamoto recommended that plaintiff not lift, push, or pull over ten pounds with his left hand; reach above shoulder height; or do fine manipulative work with either hand.  (T. 361).  According to Dr. Yamamoto,

Plaintiff's bilateral thumb operations "severely limit[ed] him in physical work."  (T. 361).

### c.   Dr. Donald Danser

On August 19, 2004, Dr. Donald Danser, a consultative psychologist, evaluated Plaintiff on behalf of the Commissioner.  (T. 437-43).  Plaintiff told Dr. Danser that he had recently begun treatment for his depression at a mental health clinic where he was seen once per month by a therapist, and that his psychiatrist had prescribed Wellbutrin, Prozac, and Ambien.  (T. 438).  Dr. Danser found that plaintiff functioned within the average range of intelligence.  (T. 440).  Plaintiff's insight into his functioning was somewhat limited.  (T. 440).  Plaintiff reported that he did not go out often, but that he routinely socialized with four close friends, watched television, and took care of his granddaughter.  (T. 440).

Dr. Danser found a slight limitation in Plaintiff's ability to remember short, simple instructions, but no limitation in his ability to carry out simple instructions, to make simple work-related decisions, or to understand, remember, and carry out detailed instructions.  (T. 442).  Plaintiff was slightly limited in his ability to interact with supervisors and in his ability to respond to work pressures in a usual work setting.  (T. 442).  Dr. Danser diagnosed panic disorder without agoraphobia and a nonspecific depressive disorder.  (T. 441).  He opined that Plaintiff had average to above average intelligence and periods of occupational sufficiency.  Dr. Danser

recommended individual psychological therapy, however, Dr. Danser stated that treatment for his depressive/anxious symptoms will not appreciably change his mental or physical functioning.  (T. 441).

### d.   Occupational Therapist Judy Freeman

Judy Freeman, an occupational therapist, performed a Residual Functional Capacity Evaluation on August 13, 2002 at the direction of Dr. Tirre.  (T. 336-46). She found that Plaintiff could lift fifty pounds from floor to knuckle, forty pounds during lumbar testing, and forty pounds during cervical testing, but he had to terminate each test when the pain in his hands became too great.  (T. 343-44).  He was able to push and pull nineteen pounds with his right arm and fifteen pounds with his left arm, and twenty-six pounds with both arms together.  (T. 344).  He showed a loss of protective sensation in two fingers on his left hand, and demonstrated a "full and consistent effort" throughout the evaluation.  (T. 344).  Ms. Freeman found that he retained the capacity to perform work at a *medium* level of exertion.  (T. 346).

### e.    Occupational Therapists Christy Health and Doris Shriver

Occupational Therapists Christy Health and Doris Shriver performed a Workers' Compensation Evaluation on December 3, 2003.  (T. 366-94).  They found that Plaintiff could not lift more than five pounds occasionally; was able to sit for three to four hours in an eight-hour workday in one- to two-hour increments with a need to alternate positions; stand for two hours in fifteen- to thirty-minute increments

with a need to alternate positions; and walk one to two hours in fifteen- to thirty-minute increments with a need to alternate positions.  (T. 374-75).  He would be able to move his hands one to two hours per day in five- to fifteen-minute increments, with pain in both hands upon use.  (T. 375).  He had a full but painful neck ROM. (T. 390).

Plaintiff "demonstrated difficulty with fine motor tasks, strength, and balance (due to pain in his right hips and legs)."  (T. 378).  He had a limited ability to dress, feed, bathe, tend to hygiene, cook, clean, shop, drive, and sleep. (T. 378-379).  He demonstrated no sensation at all in both his lateral shoulders, his right anterior shoulder, his right sacral area, the left lateral antecubital space of his arm, his right posterior wrist, and his left thumb webspace. (T. 382).  The examiners concluded that Plaintiff was  "currently functioning in the less than sedentary activity level, due to his limited lifting and carrying ability; his inability to use his hands for even occasional reaching, handling, and fingering; his need to lie down to manage severe chronic pain with sleep deprivation; and, the emotional consequences of his injury." (T. 394).

## DISCUSSION

1. <u>**Disability Standard**</u>

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial

gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than twelve months . . . ." 42

U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that he is not only unable to do his previous work but cannot,
> considering his age, education, and work experience, engage in any
> other kind of substantial gainful work which exists in the national
> economy, regardless of whether such work exists in the immediate area
> in which he lives, or whether a specific job vacancy exists for him, or
> whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520

and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity. If he is not, the [Commissioner]
> next considers whether the claimant has a "severe impairment" which
> significantly limits his physical or mental ability to basic work activities.
> If the claimant suffers such an impairment, the third inquiry is whether, based solely
> on medical evidence, the claimant has an impairment which meets or equals the
> criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has
> such an impairment, the [Commissioner] will consider him disabled without
> considering vocational factors such as age, education, and work experience; . . . .
> Assuming the claimant does not have listed impairment, the fourth inquiry is
> whether, despite the claimant's severe impairment, he has the residual functional
> capacity to perform his past work.  Finally, if the claimant is unable to perform his
> past work, the [Commissioner] then determines whether there is other work which
> the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520,

416.920.

The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step. *Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).

## 2.    **Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).  "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on*

*behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)(citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *William*s, 859 F.2d at 258.  However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).  *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

### 3.    Presumptive Disability Pursuant to Appendix 1 of 20 C.F.R. Part 404, Subpart P

Plaintiff argues that his hand conditions rose to the level of severity required by the Listing of Impairments ("the Listings") of 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Brief, p. 13-15).

The ALJ did not engage in a great deal of analysis on this subject.  (T. 21, 26).  The ALJ stated only that plaintiff's impairments were "severe," but "not 'severe' enough to meet or medically equal, either singly or in combination to one of the

impairments listed in Appendix 1 . . ."  (T. 21).  This finding was repeated in the

ALJ's conclusion.  (T. 26).  If plaintiff suffered from a "Listed Impairment," he

would be found disabled without further consideration.  20 C.F.R. §§ 404.1520(d);

416.920(d).  In order to satisfy this standard, plaintiff must establish the requirements

of Listing Section 1.02, which requires a major dysfunction of a joint or joints

characterized by a gross anatomical deformity, chronic joint pain and stiffness with

signs of limitation of motion of the affected joint(s), and findings on appropriate

medically acceptable imaging of bony destruction of the affected joint(s).  20 C.F.R.

Part 404, Subpart P, Appendix 1, § 1.02.  Additionally, plaintiff must demonstrate

involvement of one major peripheral joint in each upper extremity (*i.e.* shoulder,

elbow, or wrist-hand), resulting in inability to perform fine and gross movements

effectively, as defined in Section 1.00B(2)(c).  *Id.* § 1.02B.

Plaintiff's finger and thumb amputations served to satisfy the first requirement

of the Listings.  However, plaintiff failed to satisfy the requirement of Section 1.02B.

Fingers are not considered major peripheral joints.  20 C.F.R. Part 404, Subpart P,

Appendix 1, § 1.02B.  Plaintiff acknowledged that he had no joint dysfunction of the

wrists (Brief, p. 13) and there is no medical evidence of wrist-hand, elbow, or

shoulder dysfunction.  Moreover, although there is evidence that plaintiff may have

suffered from difficulty in fine manipulation, there is no substantial evidence which

would indicate that Plaintiff suffers a complete inability to perform fine ***and*** gross

23

movements effectively, as required by the regulations.  (*See* T. 361, 435-36, 523,

567-69).  Thus, the ALJ's determination that plaintiff's impairments do not rise to

the level of a Listed Impairment is supported by substantial evidence.

**4.**   **Treating Physician**

While a treating physician's opinion is not binding on the Commissioner, the

opinion must be given controlling weight when it is well supported by medical

findings and ***not inconsistent with other substantial evidence***.  *See Veino v.*

*Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 416.927(d).  If the treating

physician's opinion is contradicted by other substantial evidence, the ALJ is not

required to give the opinion controlling weight.  *Halloran v. Barnhart*, 362 F.3d 28,

32 (2d Cir. 2004).  The ALJ must, however, properly analyze the reasons that the

report is rejected.  *Id.*  An ALJ may not arbitrarily substitute his own judgment for

competent medical opinion.  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

If the treating physician's opinion is not given controlling weight, the ALJ

must assess the following factors: the length of the treatment relationship; the

frequency of examination for the condition in question; the medical evidence

supporting the opinion; the consistency of the opinion with the record as a whole; the

qualifications of the treating physician; and other factors tending to support or

contradict the opinion.  20 C.F.R. §§ 404.1527(d)(2)-(d)(6); 416.927(d)(2)-(d)(6).

Failure to follow the proper standard is a ground for reversal.  *Barnett v. Apfel*, 13 F.

Supp. 2d 312, 316 (N.D.N.Y. 1998) (citation omitted).

In this case, plaintiff argues that the ALJ should have afforded controlling weight to the opinion of his treating physicians, Drs. Peet and Camillo.  On May 19, 2004, Dr. Peets wrote a letter stating that Plaintiff was unable to use his hands in any meaningful type of employment; his use of his hands for lifting, pushing, pulling, and carrying was severely restricted; fine motor function was severely impaired in both hands; his postural activities were moderately limited due to left arm pain; and he was unable to do activities which required the use of his hands, such as climbing or crawling.  (T. 435).  On June 25, 2004, Dr. Peets opined that Plaintiff had difficulty with balance and squatting, and that humidity, wetness, and temperature extremes caused throbbing and aching in his shoulder, neck, and arms.  (T. 436). She also stated that Plaintiff experienced an objective impaired pinprick sensation along the anterior aspect of his left hand.  (T. 436).

The ALJ considered these evaluations from Dr. Peets, along with her entire treatment history of Plaintiff and the medical record as a whole.  (T. 18-20).  The ALJ concluded that Dr. Peets' opinion as to Plaintiff's capacities was not supported by objective medical evidence, including her own treatment notes, and therefore decided to assign her opinion less than controlling weight.  (T. 19-20).

A review of Dr. Peets' treatment notes as well as the rest of the medical record indicates that the ALJ properly chose to give less than controlling weight to her

opinion.  Dr. Peets' treatment notes consistently state that Plaintiff was alert and in no acute distress.  (T. 426-34, 449-53, 466-68).  Plaintiff saw Dr. Peets for a variety of ailments, including hip pain, migraines, urinary symptoms, and abdominal pain.  (T. 427, 428, 433, 434).  Plaintiff's hand conditions were not often mentioned in the doctor's notes.  The doctor noted that plaintiff was "applying for disability."  (T. 430).  Moreover, the treatment notes show that Dr. Peets did not treat plaintiff specifically for his hand conditions, a fact that was pointed out by the ALJ.  (T. 19).

On October 20, 2003, plaintiff visited Dr. Peets for a "disability physical."  (T. 430).  Plaintiff began complaining about work limitations involving his left hand, shoulder work, and difficulty crawling.  (T. 430).  Dr. Peets completed a disability form which is not in the record.  Plaintiff had several visits in late 2003 complaining about low back pain, depression, and migraine headaches.  (T. 431-33).  During April 2004, plaintiff was complaining about irritable bowel syndrome, and on May 19, 2004, Dr. Peets wrote a disability letter addressed "To Whom It May Concern."  (T. 435).  The record shows that Dr. Peets did not treat plaintiff for many of the restrictions she refers to in her May 19, 2004 letter.  (T. 435).

About one month later on June 17, 2004, plaintiff visited Dr. Peets requesting "further documentation regarding disability."  Dr. Peets repeated many of her statements from the May 19, 2004 letter, but expanded plaintiff's restrictions based on his statements to her.  (T. 449).  Plaintiff's physical exam was unremarkable

except he had impaired pinprick sensation on the anterior aspect of his left hand.  (T. 449).  About one week later, on June 25, 2004, Dr. Peets wrote another disability letter incorporating many statements about disability based on statements plaintiff had been making to her since he began seeking disability.  For example, on June 17, 2004, Dr. Peets found that plaintiff "is able to squat."  (T. 449).  Eight days later, she stated that "squatting is limited due to low back pain."  (T. 436).  Essentially, Dr. Peets incorporated in to her opinion statements by the plaintiff about his "limitations," although she was not treating plaintiff for these restrictions.

Additional medical evidence also provides support for the ALJ's decision to give less than controlling weight to Dr. Peets' opinion.  On July 26, 2002, Plaintiff's hand surgeon and treating physician Dr. Tirre stated that Plaintiff should be able to go back to work as he was doing well and had a good ROM in his hands.  (T. 238).  On July 29, 2002, after treating Plaintiff for several months, Dr. Tirre concluded that Plaintiff had met maximum medical improvement and sent him for a functional capacity evaluation ("FCE").  (T. 239).

This Functional Capacity Evaluation, performed by occupational therapist Judy Freeman on August 13, 2002, found that Plaintiff could lift fifty pounds from floor to knuckle, forty pounds during lumbar testing, and forty pounds during cervical testing, but he had to terminate each test when the pain in his hands became too great; he was able to push and pull nineteen pounds with his right arm and fifteen

pounds with his left arm, and twenty-six pounds with both arms together; and he showed a loss of protective sensation in two fingers on his left hand.  (T. 343-44). The FCE assessed that he retained the capacity to perform work at a *medium* level of exertion.  (T. 346).  In addition to this medical evidence, Plaintiff testified that he was able to take care of his own personal needs, drove his car at least four days per week, shopped for groceries and clothing, vacuumed, swept the floors, did some home repairs, watched television, visited friends, went to the movies and football games, and occasionally attended church.  (T. 487, 526-31).  This testimony was considered by the ALJ and lends further support to his relative weighting of the different opinions in the medical record.  (See T. 22).

Plaintiff also argues that the ALJ erroneously assigned less than controlling weight to Dr. Camillo's psychiatric opinion.  Dr. Camillo treated plaintiff between June 24, 2004 and December 29, 2004.  (T. 445-48).  It is unclear how many times plaintiff was treated by Dr. Camillo during that six month period.  Dr. Camillo assessed that plaintiff had a good ability to follow work rules and relate to coworkers; a fair ability to deal with the public, use judgment, interact with supervisors, function independently, maintain attention/concentration; a fair ability to understand, remember, and carry out simple, detailed, and complex instructions, maintain his personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability.  (T. 446-47).  Of the

many categories on which Dr. Camillo rendered his opinion, the ***only category*** where he assessed plaintiff to have a "poor" ability was that of dealing with work stress. (T. 446).  Dr. Camillo's mental assessment does not contain any written explanation or discussion of why he reached the conclusions that he did.

Contrary to Plaintiff's contention, the ALJ properly considered Dr. Camillo's opinion.  Moreover, the ALJ incorporated Dr. Camillo's opinion that Plaintiff could not tolerate high stress into his RFC determination, which found that Plaintiff retained the RFC to work at a low stress job only.  In reviewing Dr. Camillo's opinion, the ALJ properly followed the psychiatric review technique.  (T. 21); see 20 C.F.R. §§ 404.1520a, 416.920a.  Pursuant to that analysis, the ALJ found that Plaintiff suffered from a dysthymic disorder which caused mild limitations in performing his activities of daily living and maintaining social functioning.  (T. 21). The ALJ found that Plaintiff had mild deficiencies of concentration, persistence or pace, and had never exhibited an episode of decompensation of an extended duration. (T. 21).  This finding was in accordance with Dr. Camillo's opinion, and the ALJ properly integrated Dr. Camillo's opinion that Plaintiff could not tolerate high stress into his RFC determination.  Thus, the ALJ properly weighed Dr. Camillo's opinion as to Plaintiff's mental capacities.

In sum, the weight assigned by the ALJ's to Drs. Peets's and Camillo's opinions was both properly explained and supported by substantial evidence.

**5.**      **Residual Functional Capacity**

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R. §§ 404.1545; 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145 (N.D.N.Y. 1999)(citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities.  *Verginio v. Apfel*, No. 97-CV-456, 1998 WL 743706, at *3 (N.D.N.Y. Oct. 23, 1998); *LaPorta*, 737 F. Supp. at 183.

In this case, the ALJ found that plaintiff retains the RFC for low stress work, with low production quotas and lifting and/or carrying fifty pounds occasionally, forty pounds frequently, and manipulating fifteen pounds constantly, with an inability to perform fine manipulation with either hand or repetitive lifting with the left arm.  (T. 23).

To the extent that Plaintiff relies on Dr. Peets's functional assessment, the Court has already found that the ALJ properly afforded less than controlling weight to that assessment.  Additionally, the Court has already found that the ALJ properly considered Dr. Camillo's assessment in determining RFC.

Plaintiff argues that the ALJ failed to properly consider the entire medical

record when coming to his RFC determination.  (Brief, pp. 19-20).  However, the ALJ's decision contains a detailed discussion of the medical evidence ***in its entirety***. (See T. 17-23).  Moreover, the ALJ stated that he carefully considered the entire record when coming to his decision.  (T. 25); see *Jones v. Barnhart*, 2004 WL 3158536, *6 (E.D.N.Y. 2004) (citing *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

Finally, Plaintiff argues that the ALJ failed to consider all of Plaintiff's medical impairments when coming to his RFC determination.  (Brief, pp. 20-21). The ALJ considered Plaintiff's hand injuries, bilateral osteoarthritis of the hips, flare-ups of sciatic pain, and dysthymia to be "severe" within the meaning of the regulations.  See 20 C.F.R. §§ 404.1520(c), 416.920(c).  Although the ALJ did not deem Plaintiff's other alleged impairments to be severe, his decision indicates that he considered all of the medical evidence and all of Plaintiff's impairments, without regard to whether they would be considered severe if considered separately, in reaching his conclusion regarding RFC.  (T. 20-21).

For the foregoing reasons, the ALJ's assessment of Plaintiff's RFC was proper and supported by substantial evidence in the record.

## 6.   <u>Significant Work in the National Economy</u>

In this case, the ALJ concluded that Plaintiff could not perform his past relevant work, and the burden thus shifted to the Commissioner to establish that there

was other work that Plaintiff could perform which exists in significant numbers in the national economy.  (See T. 23-24, 26).  In accordance with 20 C.F.R. § 416.960(b)(2), the ALJ posed a hypothetical question to a VE.  The ALJ's hypothetical incorporated Plaintiff's demographic information as well as the ALJ's findings regarding Plaintiff's RFC.  (T. at 567-72.)  The VE concluded that Plaintiff could perform work as a surveillance systems monitor, counter clerk, and charge counselor, all jobs which exist in significant numbers in the national economy.   (T. 571-72).

Plaintiff contends that the hypothetical posed by the ALJ was not based on substantial evidence and did not adequately reflect the record as a whole.  (Brief, pp. 21-22).  To the extent that Plaintiff argues the ALJ's RFC determination was erroneous, the Court has already concluded that the ALJ's RFC determination was based on substantial evidence.  Defendant correctly argues that the hypothetical question was proper, as it reflected the ALJ's findings which have already been found to be based on substantial evidence.  (Defendant's Brief, pp. 18-19); *see Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983).  Because the hypothetical was proper, the ALJ was entitled to rely on the vocational expert's conclusion regarding Plaintiff's ability to perform work that exists in significant numbers in the national economy.  *See* 20 C.F.R. § 416.960(b)(2).

## 7.   <u>Credibility</u>

The ALJ has discretion to appraise the credibility of witnesses, including testimony of a plaintiff concerning subjective complaints of pain. *See Mimms v. Heckler*, 750 F.2d 180, 185-86 (2d Cir. 1984). After considering a claimant's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject a claimant's subjective testimony. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4) (2007); *Martone*, 70 F. Supp. 2d at 151.

If the ALJ rejects a claimant's subjective testimony, he or she must explicitly state the basis for doing so with sufficient particularity to enable a reviewing court to determine whether those reasons for disbelief were legitimate, and whether the determination is supported by substantial evidence. *Martone*, 70 F. Supp. 2d at 151 (citing *Brandon v. Bowen*, 666 F. Supp. 604, 608 (S.D.N.Y. 1987). Where the ALJ's findings are supported by substantial evidence, the reviewing court must uphold the ALJ's decision to discount Plaintiff's subjective complaints of pain. *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (citing *McLaughlin v. Sec'y of Health, Educ. & Welfare*, 612 F.2d 701 (2d Cir. 1980).

The ALJ's decision acknowledged the existence of severe impairments and Plaintiff's accompanying allegations of pain and limitations, but found that Plaintiff's testimony regarding his symptoms was not consistent with the medical record as a whole. (T. 22-23). In reaching this decision, the ALJ noted that Plaintiff testified to performing daily activities such as home repairs, reading, watching

television, visiting with friends, going to the movies and church occasionally, attending football games, and some childcare.  (T. 22; see T. 487, 526-31).  The ALJ also discussed Dr. Yamamoto's report that Plaintiff had been unable to find work, citing 20 C.F.R. Sections 404.1566(c) and 416.966(c) for the proposition that a plaintiff will not be found disabled if his RFC makes it possible for him to do work which exists in significant numbers in the national economy, even though he remains unemployed due to an inability to get work, lack of work in his social area, the hiring practices of employers, or lack of job openings.  (T. 23).

The ALJ's analysis of Plaintiff's credibility is thorough and the ALJ's reasons for discounting Plaintiff's credibility are readily apparent from a review of the decision.  The ALJ's finding about plaintiff's credibility is supported by substantial evidence in the record.

**WHEREFORE**, it is hereby

**RECOMMENDED**, that the Commissioner's decision denying disability benefits be **AFFIRMED** and plaintiff's complaint be **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN**

**DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d

85 (2d Cir. 1993) (citing *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d

Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: January 14, 2008

Hon. Gustave J. DiBianco
U.S. Magistrate Judge